IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

APRIL STIDOM,                           )        CASE NO. 5:21-cv-211
                                        )
              Plaintiff,                )        DISTRICT JUDGE
                                        )        CHARLES ESQUE FLEMING
       v.                               )
                                        )        MAGISTRATE JUDGE
COMMISSIONER OF SOCIAL                  )        AMANDA M. KNAPP
SECURITY ADMINISTRATION,                )
                                        )        **REPORT AND RECOMMENDATION**
              Defendant.                )

Plaintiff April Stidom ("Plaintiff" or "Ms. Stidom") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. §

405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider all subjective complaints and objective evidence

relevant to Ms. Stidom's severe medically determinable mental impairments, should accurately

discuss the significant probative evidence, should resolve any conflicts in evidence, and should

ensure that he builds an accurate and logical bridge between the evidence and the result.  To the

1

extent the ALJ concludes the dissociative symptoms do not relate to a medically determinable impairment, the grounds for that conclusion should be clearly set forth in the decision.

## I.  Procedural History

On December 19, 2018, Ms. Stidom filed an application for SSI.  (Tr. 110.)  She alleged a disability onset date of December 1, 2016.  (*Id*.)  She alleged disability due to depression, bipolar, anxiety, dissociative disorder, asthma, and acid reflux.  (*Id*.)  Ms. Stidom's application was denied at the initial level (Tr. 110-24) and upon reconsideration (Tr. 145-51), and she requested a hearing (Tr. 156-61).  On March 3, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 83-109.)

On March 11, 2020, the ALJ issued a decision finding that Ms. Stidom had not been under a disability within the meaning of the Social Security Act from December 19, 2018 through the date of the decision.  (Tr. 67-78.)  On December 8, 2020, the Appeals Council denied Ms. Stidom's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)

On January 27, 2021, Ms. Stidom filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 14, 17, 18.)

## II. Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Stidom was born in 1986, and was 32 years old on the application date, making her a younger individual under Social Security Regulations at all relevant times.  (Tr. 77.)  She graduated from high school, having received some educational services through an IEP.  (Tr. 77, 242, 310-52.)  She has no past relevant work.  (Tr. 76.)

**B.      Medical Evidence**

Although the ALJ identified severe physical impairments (Tr. 69), Ms. Stidom's

challenge in this case relates specifically to the ALJ's evaluation of her mental impairments.

(ECF Doc. 14 p. 12.)  The evidence summarized herein is accordingly focused on Ms. Stidom's

mental impairments.

**1.      Relevant Treatment History**

On May 26, 2018, a family member brought Ms. Stidom to the emergency department

("ED") with stroke-like symptoms, including being unable to speak, walking with difficulty, and

experiencing weakness on her left side. (Tr. 391-92.)  After being in the ED for a while, she was

able to start communicating through writing.  (Tr. 394.)  CT and CTA imaging was negative, and

there was no evidence of aneurysm.  (*Id*.)  Urine analysis was positive for cannabinoids, and the

clinical impression was complex migraine vs. conversion reaction vs. stroke. (Tr. 393, 395.)

On September 10, 2018, Ms. Stidom underwent an intake assessment at Phoenix Rising

Behavioral Healthcare ("Phoenix Rising"), complaining of anxiety, depression, anger, and mood

swings so severe that "she hardly leaves her house anymore." (Tr. 759-71.)  She had recently

separated from her boyfriend and had a miscarriage the week before, prompting her to call for

mental health support.  (Tr. 759.)  She believed she had multiple personality disorder, with at

least three other personalities, and described dressing differently, blacking out, and being unable

to remember her actions as the other personalities.  (*Id*.)  Ms. Stidom described a history of

physical and sexual abuse by a prior boyfriend and an ex-husband.  (Tr. 762.)  On examination,

Ms. Stidom was cooperative, anxious, and irritable, with full affect, rapid speech, racing thought

process, depersonalizations, auditory, visual, and tactile hallucinations, paranoid thought content,

normal cognition, average intelligence, normal insight, and mildly impaired judgment.  (Tr. 764.)

She had red marks on her body and reported scratching because she felt like bugs were on her. (Tr. 765.)  She reported paranoid thoughts that people were watching and listening to her in her apartment.  (*Id*.)

Ms. Stidom returned to Phoenix Rising for a counseling appointment with Victoria Machan, LPC, on September 19, 2018.  (Tr. 754-57.)  She reported frequent blackouts and having "moods" or "personalities" come out.  (Tr. 757.)  She left the session to use the restroom, and identified herself on return as a nine-year-old child named Amelia while speaking and holding her body in a childlike manner.  (*Id*.)  Ms. Machan ended the session and sought support from a supervisor, who assessed Ms. Stidom as capable of safely walking to her father's home. (*Id*.)  On examination, she displayed depressed and silly mood, full and flat affect, rapid and slow speech, incoherent thought process, depersonalizations, memory impairment, average intelligence, partial insight, and moderately impaired judgment. (Tr. 755.)

On October 1, 2018, Ms. Stidom saw psychiatrist Brian Braumiller, D.O. at Phoenix Rising for medication management with psychotherapy.  (Tr. 748-52.)  She reported ongoing mood swings, irritability, flying off the handle, crying spells, and concentration problems.  (Tr. 748.)  On examination, she appeared "generally normal" and cooperative, with depressed, anxious, and irritable mood, normal thought content and perception, and impaired attention and concentration.  (Tr. 749.)  Dr. Braumiller diagnosed mood disorder, marijuana dependence, postpartum mood disturbance, and PTSD, and discontinued Lamictal.  (Tr. 750-52.)  He started Trileptal for moods, increased Trazodone for sleep, and continued Remeron.  (*Id*.)

On October 9, 2018, Ms. Stidom returned to Ms. Machan for therapy.  (Tr. 736-40.)  She reported that she could not remember a portion of her prior appointment.  (Tr. 740.)  She also reported that her son told her two other personalities named Secret and Amelia played with him,

"and it was me, but not me." (*Id.*)  She stated her medications were not making a difference. (*Id.*)  On examination, she displayed euthymic mood, full affect, clear speech, logical thought process, and normal perception, cognition, insight and judgment.  (Tr. 737.)

On December 18, 2018, Ms. Stidom saw Jennifer Spies, MSN, CNP for medication management. (Tr. 729-35.)  Examination results were "generally normal," with euthymic mood, full affect, clear speech, logical thought process and normal perception, cognition, impaired insight, and borderline intelligence.  (Tr. 731.)  Nurse Spies noted no change in diagnosis, continued prescriptions for Remeron and Trazodone, increased the dosage of Trileptal, and recommended Ms. Stidom return in eight weeks.  (Tr. 734-35.)

Ms. Stidom returned to Ms. Machan on January 9, 2019 for therapy.  (Tr. 724-28.) Examination results were "generally normal," including cooperative attitude, euthymic mood, full affect, clear speech, logical thought process, and normal perception, cognition, insight and judgment.  (Tr. 725.)  It was noted that Ms. Stidom did not respond to her first name when called in the lobby, but willingly followed Ms. Machan back to her office once approached.  (Tr. 728.) Ms. Stidom reported that working at Chipotle was fun and easy, but also that she had been bullied and quit due to "mean coworkers." (*Id.*)  She reported being comfortable at home with her emotional support dog. (*Id.*)  On examination, she displayed a flat affect, intense eye contact, and slow speech. (*Id.*)  Although she used developmentally appropriate vocabulary, she had a child-like delivery, and a whiney tone when speaking. (*Id.*)  She reported experiencing more blackouts, and that her medications did not work. (*Id.*)

Ms. Stidom returned to Nurse Spies on January 30, 2019 for medication management, accompanied by her son.  (Tr. 717-23.)  She reported that she did not feel her daytime medication was working because she had ongoing mood swings, difficulty sleeping, difficulty

leaving the house and being around others, and felt like people were talking about her and looking at her.  (Tr. 718.)  She had stopped taking her Trileptal a few days prior.  (*Id*.)  On examination, she displayed euthymic mood, full affect, clear speech, logical thought process, estimated borderline intelligence, and impaired insight.  (Tr. 719.)  Nurse Spies noted minimal progress.  (Tr. 722.)  She stopped Trileptal, started Risperidone, and continued Trazodone and Mirtazapine.  (Tr. 723.)

On January 31, 2019, Ms. Stidom returned to Ms. Machan for therapy, accompanied by her son.  (Tr. 712-16.)  Examination results included depersonalizations and paranoid thought content.  (Tr. 713.)  Ms. Stidom brought her journal and reported that the cursive handwriting was hers, but that she did not know who had written the four additional styles of handwriting. (Tr. 716.)  Ms. Machan observed that some of these entries encouraged hitting her partner on the head with a bat, while others expressed fear or optimism. (*Id*.)

Ms. Stidom retuned to Ms. Machan for therapy on February 28, 2019, but indicated she was not sure who Ms. Machan was.  (Tr. 707-11.)  Ms. Stidom initially displayed full affect and was talkative and outgoing.  (Tr. 711.)  She stated her name was Kylie, described herself as "sassy," and stated this was her eighteenth birthday and she planned to go shopping.  (*Id*.)  She provided some additional information about other alternate personalities, including Bubba, Amelia, Secret, and Alice.  (*Id*.)  With about twenty minutes left in the session, Ms. Machan noted that her affect changed and she appeared scared, nervous and confused.  (*Id*.)  She reported that she did not remember the beginning of the session.  (*Id*.)

On March 20, 2019, Ms. Stidom returned to Nurse Spies for medication management. (Tr. 779-87.)  She reported that she had moved into a new house the prior week, and was spending her days cleaning, caring for her dog, and grocery shopping independently.  (Tr. 780.)

However, she reported that she experienced blackouts one to two times per week, during which she lost track of half the day, and had an "an ongoing issue with seeing a shadow." (*Id.*) Nurse Spies instructed her to see a neurologist regarding the blackouts. (*Id.*) Ms. Stidom reported that Risperdone was not beneficial, and she had smoked cannabis once in the last three weeks and had ongoing issues with low frustration tolerance, anger, and irritability. (*Id.*) On examination, she displayed avoidant eye contact, evasive attitude, euthymic mood, full affect, underproductive and childlike speech, slowed thinking and activity, borderline intelligence, and impaired insight and judgment. (Tr. 781.) Nurse Spies reported "no progress," discontinued Risperidone, started Seroquel, and continued Trazodone and Mirtazapine. (Tr. 785.)

On April 4, 2019, Ms. Stidom returned to Ms. Machan for therapy, where she initially displayed clear speech, normal eye contact, and calm demeanor. (Tr. 774-78.) She was tearful when discussing her mother's passing five years prior. (Tr. 778.) However, Ms. Machan noted that Ms. Stidom's affect changed when they discussed Ms. Machan's resignation. (*Id.*) She slumped, stopped making eye contact, and spoke with a lisp. (*Id.*) She asked Ms. Machin to "[t]alk to [Nurse Spies] and tell her what you observe." (*Id.*)

Ms. Stidom returned to Nurse Spies for medication management on May 9, 2019. (Tr. 853-59.) She reported she had not seen a neurologist because Ms. Machin told her she didn't have to. (Tr. 854.) Nurse Spies again instructed Ms. Stidom to see a neurologist to rule out a medical cause for her blackouts, given her history of stroke and memory loss. (Tr. 854.) Ms. Stidom reported increased blackouts since starting Seroquel but was unable to describe them other than to say she lost time. (*Id.*) She said she was never home alone with her son because her boyfriend was always there. (*Id.*) Instead of napping during the day, she reported taking walks, and had recently cut her son's hair. (*Id.*) She reported fewer peripheral shadows, but

7

continued irritability and anxiety during the day, with two outbursts that week, down from daily. (*Id*.)  Nurse Spies started Pristiq, increased the dosage of Seroquel, and continued Trazodone and Prozac.  (Tr. 858-59.)

On May 15, 2019 Ms. Stidom saw counselor Chase Harshbarger, LPC, CDCA, for the first time.  (Tr. 848-52.)  He noted her diagnoses of PTSD, cannabis dependence, and mood disorder.  (Tr. 851.)  Mr. Harshbarger supported Nurse Spies' suggestion that Ms. Stidom see a neurologist to rule out medical reasons for her reported blackouts, noting "further investigation needed to diagnose DID [dissociative identity disorder]."  (*Id*.)  Ms. Stidom explained her mind was always racing, causing her to forget what she was doing in the moment.  (*Id*.)  She also reported that she wanted to keep her current treatment goal of managing her anxiety because it was impacting her daily living and making her feel edgy, nervous, and defensive.  (*Id*.)

Ms. Stidom returned to Nurse Spies on June 19, 2019.  (Tr. 841-47.)  She reported her medications had helped to slow her thought process.  (Tr. 842.)  She stated "neurocare" had denied her referral because she had been discharged from their practice due to missed appointments.  (*Id*.)  Nurse Spies again discussed the importance of getting this exam.  (*Id*.)  Ms. Stidom reported a decrease in her blackouts, racing thoughts, and peripheral shadows, but also reported ongoing issues with poor short-term memory.  (*Id*.)  She reported using cannabis one to two times per week, not daily.  (*Id*.)  She also reported ongoing issues with anxiety and irritability, with two outbursts that week directed at her boyfriend, reportedly decreased from daily.  (*Id*.)  On examination, she displayed depressed, anxious, irritable mood, flat affect, clear speech, logical thought process, estimated borderline intellect, and impaired insight and judgment.  (Tr. 842-43.)  Nurse Spies noted fair insight and judgment and "some progress" in treatment.  (Tr. 846.)  She increased Ms. Stidom's Pristiq and continued her Seroquel.  (Tr. 847.)

On July 3, 2019, Ms. Stidom had a therapy session with Mr. Harshbarger, accompanied by her son.  (Tr. 836, 840.)  Mr. Harshbarger noted "minimal progress" and "no significant change."  (Tr. 836-37.)  Although he suggested her son sit outside the room at a nearby table, she refused to let him leave the room.  (Tr. 840.)  She reported having had "a few" blackouts since her last session, and showed some insight into what happened to her body when coming out of a blackout.  (Tr. 836-37, 840.)  On examination, she displayed euthymic mood, full affect, clear speech, logical thought process, average intelligence, and normal insight and judgment.  (Tr. 837.)  Ms. Stidom reported: finding writings and drawings she did not remember completing; zoning out; losing track of time; and hearing a voice telling her "to not let anyone hurt us."  (*Id*.)

Ms. Stidom missed an appointment with Nurse Spies on August 14, 2019. (Tr. 832-35.) At her next appointment on October 2, 2019, she reported she had dropped a garage door on her face at the end of July and had been seeing her primary care provider for treatment of headaches since that time.  (Tr. 885-92.)  She also reported she had worked at Chipotle for thirty days but was unable to continue because she was shaking and crying, had called off a few times, felt like she could hear everyone breathing, and did not like having to do a split-shift.  (Tr. 886.)  She reported ongoing issues with anxiety, excessive worries, guilt, and peripheral shadows, but also reported using cannabis daily.  (*Id*.)  On examination, she displayed euthymic mood, full affect, clear speech, logical thought process, average intelligence, and normal insight and judgment. (Tr. 887.)  Nurse Spies increased her dosage of Seroquel, started Benztropine, continued Pristiq and Trazodone, and recommended she follow up in six weeks.  (Tr. 892.)

Ms. Stidom saw Mr. Harshbarger for therapy again on November 11, 2019.  (Tr. 880.) He noted minimal progress.  (*Id*.)  She presented as timid and soft spoken, and reported she had been isolating herself at her house and felt anxious when going out in public.  (Tr. 883.)  Mr.

Harshbarger noted she was tearful at times when discussing the voices she heard in her head and had a hard time verbalizing her concerns, but was receptive to art therapy. (*Id*.)

At a medication management appointment with Nurse Spies on November 13, 2019, Ms. Stidom reported: ongoing headaches; that her benztropine was effective initially for her "moving legs" but was no longer effective; that a friend was helping to try to get her a job as a prep cook at a pizza shop; and that she had been smoking cannabis daily.  (Tr. 873.)  On examination, she displayed euthymic mood, full affect, clear speech, logical thought process, average intelligence, and impaired insight and judgment.  (Tr. 874.)  Nurse Spies noted fair insight and judgment and "some progress" since her last visit.  (Tr. 878.)  She continued Seroquel, Pristiq, and Trazodone, increased her dosage of Benztropine, and recommended she follow up in eight weeks.  (Tr. 879.)

On January 6, 2020, Ms. Stidom was late for a medication management appointment with Nurse Spies.  (Tr. 899.)  She reported difficulty leaving the house and applying for jobs, as well as daily cannabis use.  (*Id*.)  Nurse Spies continued her Seroquel, Benztropine, Pristiq, and Trazodone, added Hydroxyzine to be taken thirty minutes before leaving the house, and recommended she follow up in six weeks.  (Tr. 904.)

On January 7, 2020 Ms. Stidom returned to Mr. Harshbarger for therapy.  (Tr. 894.) Mr. Harshbarger noted "minimal progress."  (*Id*.)  Ms. Stidom initially presented as reserved and agreed that her care should be transferred to a female counselor.  (Tr. 897.)  During the session, she was observed to become disoriented and child-like, saying her name was Amelia and she was six years old.  (Tr. 897.)  She sat on the floor and played with toys.  (*Id*.)  Mr. Harshbarger gave her cold water and engaged her in belly breathing for grounding.  (*Id*.)  After belly breathing, Ms. Stidom appeared confused, but was able to identify where she was.  (*Id*.)  A supervisor evaluated her as safe to leave.  (*Id*.)

10

Ms. Stidom missed a medication management appointment on February 18, 2020 (Tr. 939), but returned to Nurse Spies on February 20, 2020 (Tr. 931-38).  She reported fewer headaches, but her sleep was fragmented due to hip pain.  (Tr. 932.)  She reported smoking cannabis daily and spending her time watching movies, playing with her dogs, cleaning her house, cooking for her son, and going to the grocery store with her sister.  (*Id*.)  Nurse Spies noted unremarkable examination results, including fair insight, fair judgment, and "some progress." (Tr. 933, 937.)  She continued Ms. Stidom's medications without change.  (Tr. 938.)

## 2.  Opinion Evidence

### i.  Consultative Examinations

In conjunction with a prior claim, Ms. Stidom underwent a psychological evaluation by James Lyall, Ph.D. on June 19, 2008.  (Tr. 353-59.)  Dr. Lyall administered the Wechsler Adult Intelligence Scale – III, and Ms. Stidom scored a verbal IQ of 74, performance IQ of 72, and full-scale IQ of 70.  (Tr. 358.)

On examination, Ms. Stidom displayed "some difficulty understanding moderately complex questions."  (Tr. 354-58.)  She spoke slowly, but her responses were relevant and coherent, and she reported a history of depression, anxiety, and bad dreams about "people trying to get me."  (Tr. 354.)  She reported a history of blackouts and hearing muffled voices, and stated she did not trust people.  (*Id*.)  Dr. Lyall noted her history of poor judgment with criminal activity and opined: "She has less than average intelligence, which complicates her ability to follow clear goal paths. She seems to lack insight into her psychological difficulties."  (Tr. 355.)  Dr. Lyall diagnosed bipolar disorder I, PTSD, cannabis abuse, and borderline intellectual functioning.  (*Id*.)  He assigned a GAF scale score of 55, indicating moderate impairment in functioning.  (*Id*.)  With regard to work-related mental abilities, he opined Ms. Stidom would be

11

moderately impaired in: social interaction due to her social anger difficulties; the ability to understand and follow instructions; and the ability to maintain attention and perform simple, repetitive tasks.  (Tr. 356.)  He opined she would be markedly impaired in her ability to withstand the stress and pressure associated with day-to-day work activity.  (*Id*.)  Dr. Lyall expressed "some doubt" about her ability to manage any funds awarded due to her intelligence and marijuana abuse.  (Tr. 357.)

### ii.      Function Reports

Ms. Stidom filled out a function report with the help of her attorney on February 6, 2019.  (Tr. 263-70.)  She reported that she got anxious around people when she worked, and sometimes her hands shook and her heart raced.  (Tr. 263.)  Daily activities included: getting her son ready for school; feeding, watering, and walking her dog; preparing meals for herself and her son; and sweeping, dusting, and doing dishes.  (Tr. 264-65.)  She grocery shopped twice per month with her boyfriend's help.  (Tr. 266.)  Her hobbies were drawing and writing in her journal, and her social activities included talking to her sister on the phone weekly.  (Tr. 267.)  She reported that her medications made her drowsy.  (Tr. 269-70.)

### iii.      Educational Records

School records show Ms. Stidom had an IEP while enrolled in GlenOak High School in 2002-2003, and needed glasses.  (Tr. 310-52.)

### iv.      State Agency Reviewers

On February 28, 2019, state agency reviewing psychologist Sandra Banks, Ph.D., reviewed the record and opined that Ms. Stidom had moderate impairments in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manager oneself.  (Tr. 116.)  Dr. Banks opined that Ms. Stidom

12

could understand and remember simple one-to-three step instructions, carry out simple repetitive tasks in a setting without high production quotas or a need for sustained focus and attention, and could maintain appropriate behavior in a work setting that did not require interaction with the general public.  (Tr. 120-21.)  She opined that interactions with supervisors and coworkers should be "brief and superficial."  (Tr. 121.)  Dr. Banks also opined that Ms. Stidom would have difficulty adjusting to rapidly changing work situations, but could adapt to an environment where day-to-day job duties were consistent.  (Tr. 138.)  These findings were affirmed by state agency psychologist Aracelis Rivera, Psy.D., on reconsideration.  (Tr. 132-33, 137-38.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At her March 3, 2020 hearing, Ms. Stidom testified that she lived in Canton with her nine-year-old son.  (Tr. 90.)  She was a high school graduate.  (Tr. 89.)  She tried to go to nursing school a couple of years prior but stayed only a couple of months.  (Tr. 94-95.)  She could not pass her classes because she did not know how.  (Tr. 95.)

With regard to prior work, she testified that she last worked briefly at Chipotle, but the job ended because she found it hard to be around people.  (Tr. 91-92.)  She testified she got angry at a girl who worked on the line with her but wouldn't stand beside her, and told her "I was going to slam her face off the counter."  (Tr. 99-100.)  Before Chipotle, she worked at Case Farms.  (Tr. 101.)  She left that job because it was hard, she kept getting sick, and they wouldn't let her have a day off.  (*Id*.)

With regard to activities of daily living, she testified that her sister and boyfriend helped her make a list of what she needed to do each day, such as cleaning and taking care of the dogs.  (Tr. 93.)  She did her own laundry, but it took a while because she had to go to a laundromat.

(Tr. 93-94.)  She saw her boyfriend daily, and they sometimes went out to shop or eat.  (Tr. 94.)

She sometimes shopped by herself, but it was difficult.  (Tr. 101.)  Her sister was a truck driver,

so she did not see her often, but they talked on the phone every day.  (Tr. 94.)  A friend took her

to the grocery store, to doctor appointments for herself and her son, and to her son's school

activities because she was too nervous to drive.  (Tr. 94-95.)  She brought her son to counseling

appointments if he did not have school because she did not have a babysitter.  (Tr. 97.)

She received counseling and medication at Phoenix Rising, and felt the medications

helped "a little bit."  (Tr. 92.)  However, she reported that she continued to have symptoms that

included getting angry and not wanting to leave her house or her bed.  (*Id*.)  She had hit her

boyfriend more than five times when having angry outbursts but testified she usually could not

remember it.  (Tr. 98-99.)  She reported sometimes having "blackouts" where she could not

remember what had happened for a few hours.  (Tr. 97.)  She saw shadows and heard mumbled

voices.  (Tr. 98.)  The medications caused dry mouth and made her sleepy.  (Tr. 91.)  Sometimes

she had panic attacks that lasted twenty or thirty minutes, in which she stated her head got dizzy,

her "heart beats," and she felt like she could not breathe.  (Tr. 93.)  She smoked marijuana a

couple of times per week when she felt her medication was not working and she got really

anxious.  (Tr. 96.)  She got the marijuana from a friend.  (*Id*.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 102-03.)  The VE testified that a hypothetical

individual of Ms. Stidom's age, with a high school education, no past relevant work, and the

function limitations described in the ALJ's RFC determination could perform representative

positions in the national economy, including marker, mail clerk, and photocopying machine

operator.  (Tr. 77, 104-05.)

14

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his March 11, 2020 decision, the ALJ made the following findings:[2]

1. The claimant has not engaged in substantial gainful activity since December 19, 2018, the application date. (Tr. 69.)

2. The claimant has the following severe impairments: asthma, bilateral carpal tunnel syndrome, obesity, mood disorder/bipolar disorder, posttraumatic stress disorder, cannabis abuse, and borderline intellectual functioning. (*Id*.)

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 70.)

4. The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), except avoid concentrated exposure to temperature extremes of hot/cold and humidity; avoid concentrated exposure to dusts, fumes, gases, odors, and poorly ventilated areas; avoid workplace hazards such as unprotected heights or exposure to dangerous, moving machinery; limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; no directing the work of other or being responsible for the safety or welfare of others; no piece rate work or

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

16

assembly line work; and no more than occasional interaction with others. (Tr. 72-73.)

5.   The claimant has no past relevant work.  (Tr. 76.)

6.   The claimant was born in 1986 and was 32 years old, defined as a younger individual age 18-49, on the date the application was filed.  (Tr. 77.)

7.   The claimant has at least a high school education and is able to communicate in English.  (*Id*.)

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id*.)

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including marker, mail clerk, and photocopy machine operator.  (*Id*.)

Based on the foregoing, the ALJ determined that Ms. Stidom had not been under a disability, as defined in the Social Security Act, from December 19, 2018 through the date of the decision on March 16, 2020.  (Tr. 78.)

## V. Plaintiff's Arguments

Ms. Stidom argues the ALJ's finding that she retained an RFC to perform a range of light unskilled work lacked the support of substantial evidence because it was based on an incomplete analysis of the evidence of her mental impairment.  (ECF Doc. 14 p. 1.)

## VI. Law & Analysis

### A.   Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v.*

*Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654

("Generally, … we review decisions of administrative agencies for harmless error.").  A decision

will also not be upheld where the Commissioner's reasoning does not "build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875,

877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **Assignment of Error: Whether ALJ Erred by Providing an Incomplete Analysis of the Evidence Relating to Plaintiff's Mental Impairments**

Ms. Stidom asserts that the ALJ erred by failing to consider the impact of her dissociative

symptoms on her RFC, as she asserts was required by Social Security Ruling ("SSR") 96-8p.

(ECF Doc. 14 p. 12; ECF Doc. 18 p. 2.)  She contends "the analysis of Listings 12.04 and 12.15

and the analysis of … residual functional capacity cannot be found to be complete or accurate

without any mention of [her] episodes of dissociation – both reported and observed."  (*Id*. at pp.

13-14.)  The Commissioner responds that the ALJ "reasonably found that Plaintiff's dissociative

personality disorder was not a medically determinable impairment, as it was not established by

evidence from an acceptable medical source."  (ECF Doc. 17 p. 4, *see also* Tr. 70.)  Therefore,

the Commissioner asserts the ALJ was not required to consider evidence relating to that disorder

at any point in his decision.  (ECF Doc. 17 p. 5.)

**1.**     **Whether Inquiry Ends with ALJ's Step Two Finding that Dissociative Disorder Was a Non-Medically Determinable Impairment**

At Step Two, an ALJ must determine whether the alleged impairments are "medically

determinable."  20 C.F.R. § 404.1508.  A medically determinable impairment must result from

anatomical, physiological, or psychological abnormalities which can be shown by medically

19

acceptable clinical and laboratory diagnostic techniques, and must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *See id.*; *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 698 (6th Cir. 2006).  Only evidence from an "acceptable medical source," such as a medical doctor, can establish a medically determinable impairment.  20 C.F.R. § 404.1513(a).  Ms. Stidom bears the burden of demonstrating that her impairments are both "severe" and "medically determinable" at Step Two.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)(ii)); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Here, the ALJ concluded that Ms. Stidom's alleged dissociative disorder was "a non-medically determinable impairment" because "[t]here is no formal diagnosis of this condition by an acceptable medical source in the record."  (Tr. 70.)  Ms. Stidom does not challenge this finding, and has not identified record evidence suggesting that she had a medically determinable impairment of dissociative identity disorder.  (*But cf.* Tr. 851 (noting "further investigation needed to diagnose DID").)  Instead, she contends that the ALJ erred because he was required to "consider all conditions and their impact on a residual functional capacity, severe or non-severe" under SSR 96-8p.  (ECF Doc. 14 p. 12.)

The Commissioner observes that the ALJ did not find dissociative disorder to be a "nonsevere" impairment, but instead found it "non-medically determinable."  (ECF Doc. 17 pp. 3-4.)  Based on this distinction, the Commissioner argues the ALJ "was not required to consider evidence relating to [dissociative] disorder at any point in his decision," since SSR 96-8p provides: "'[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s).'"  (ECF Doc. 17 p. 5 (quoting SSR 96-8p).)

The Commissioner is correct that an ALJ "must consider only limitations and restrictions attributable to medically determinable impairments" in assessing an RFC.  SSR 96-8p, 61 Fed. Reg. 34474, 34476 (July 2, 1996).  SSR 96-8p explains: "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."  *Id.* at 34475.  Thus, if it were clear from the record that the dissociative symptoms at issue related <u>only</u> to Ms. Stidom's non-medically determinable dissociative disorder, the Commissioner's arguments on this point would likely prevail.  Ms. Stidom has not cited authority suggesting that an ALJ must consider signs or symptoms that relate only to a non-medically determinable impairment at Steps Three or Four, and the undersigned is aware of no such authority.

However, it is ultimately not clear from the record that the signs and symptoms at issue relate <u>only</u> to the dissociative identity disorder found to be non-medically determinable.  That is because the ALJ found numerous other mental impairments to be both medically determinable and severe, including: "mood disorder/bipolar disorder, posttraumatic stress disorder, cannabis abuse, and borderline intellectual functioning."  (Tr. 69.)  A review of the treatment records cited by Ms. Stidom reveals that the relevant signs and symptoms were observed and recorded by her mental health treatment providers in the course of her ongoing treatment for her medically determinable mental impairments.  The fact that her providers considered a possible additional diagnosis of dissociative identity disorder based on those observations is far from a medical finding that the signs and symptoms they recorded at length in their treatment notes were <u>not</u> related to any of the existing mental impairments for which she was receiving treatment.

Indeed, it is observed that dissociative symptoms can be related to post-traumatic stress disorder, an impairment found both medically determinable and severe in this case.  *See, e.g.,*

*Klapp v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02850-JDG, 2022 WL 310228, at *4 (N.D.

Ohio Feb. 2, 2022) ("Mann diagnosed Klapp with bipolar disorder, moderate, with anxious

distress (severe) and mixed features, as well as post-traumatic stress disorder with dissociative

symptoms and delayed expression."); *Nimrod v. Kijakazi*, No. 1:20-CV-678, 2021 WL 4291224,

at *4 (N.D. Ohio Sept. 21, 2021) ("'He has experienced extensive trauma and current symptoms

meet criteria for [PTSD] with dissociative symptoms (F43.10); anxiety (F41.9); and depression

(F32.9)' with bipolar disorder also under consideration."); *Jackson v. Comm'r of Soc. Sec.*

*Admin.*, No. 1:17-CV-2039, 2018 WL 3956878, at *2 (N.D. Ohio Aug. 17, 2018) ("Black stated

that Jackson suffers from posttraumatic stress disorder with dissociative symptoms…"); *Vandick*

*v. Colvin*, No. 3:14-CV-00269-MC, 2015 WL 364341, at *3 (D. Or. Jan. 23, 2015) ("Dr.

Schwartz noted that plaintiff had a '[history of] PTSD from childhood trauma now with

suggestions of [d]issociative symptoms in spectrum approaching DID.'").

    SSR 96-8p calls for consideration of "functional limitations and restrictions that result

from an individual's medically determinable impairment or combination of impairments,

*including the impact of any related symptoms*."  61 Fed. Reg. at 34475 (emphasis added).  Ms.

Stidom argues the ALJ's analysis of the listings at Step Three and the RFC at Step Four was not

"complete or accurate" because he did not "mention … Plaintiff's episodes of dissociation – both

reported and observed."  (ECF Doc. 14 p. 14.)  The Commissioner's opposition relies on an

assumption that the dissociative symptoms at issue were not related to Ms. Stidom's medically

determinable mental impairments of mood disorder/bipolar disorder or post-traumatic stress

disorder.  The undersigned does not find this assumption to be clearly supported by the record,

and will accordingly proceed to an analysis of Ms. Stidom's argument that the ALJ erred at Steps

Three and Four of the sequential analysis by not discussing the relevant signs and symptoms.

2.     **Whether ALJ Findings Regarding Mental Impairments at Steps Three and
Four Were Supported by Substantial Evidence**

Ms. Stidom argues that neither the ALJ's analysis of the mental Listings (Step Three) nor

his RFC determination (Step Four) was supported by substantial evidence because the ALJ did

not discuss Ms. Stidom's complaints of dissociative symptoms or the dissociative episodes

observed by her mental health providers.  A review of the ALJ decision as a whole demonstrates

that he did not discuss the described evidence in his analysis at Steps Three and Four.

In support of his finding that Ms. Stidom did not meet or medically equal listings 12.04,

12.05, or 12.15 at Step Three, the ALJ provided the following analysis:

> In understanding, remembering or applying information, the claimant has a
> moderate limitation.  Although the claimant received a diagnosis of borderline
> intellectual functioning, a mental status examination performed at Phoenix Rising
> Behavioral Health in 2020 revealed that she was alert and oriented to all spheres,
> there was no evidence of cognitive impairment noted, her intelligence was
> estimate[d] to fall within the average range for her age, and her thought processes
> were logical (Exhibit 21F, pg. 5).

> In interacting with others, the claimant has a moderate limitation.  The claimant
> testified that she has difficulty being around other people, and experiences panic
> attacks and frequent mood swings (hearing testimony).  However, upon mental
> status examination at Phoenix Rising in 2020, the claimant had a euthymic mood,
> with a full affect, her speech was clear, and there was no evidence of hallucinations
> or delusions (Exhibit 21F, pg. 5).

> With regard to concentrating, persisting or maintaining pace, the claimant has a
> moderate limitation.  The claimant testified that she has difficulty with maintaining
> attention and concentration, and experiences panic attacks and mood swings
> (hearing testimony).  However, a mental status examination performed at Phoenix
> Rising in 2020 revealed that the claimant was alert and oriented to all spheres, her
> thought processes were logical, her thought content was normal, and there was
> impairment of her attention and concentration skills (Exhibit 21F, pg. 5).

> As for adapting and managing oneself, the claimant has experienced a moderate
> limitation.  The claimant testified that on a typical day, her boyfriend makes a list
> of things for her to do, including cooking, household chores such as laundry, taking
> care of their dogs, and going grocery shopping with a friend (hearing testimony).

(Tr. 70-71.)

In support of his further finding that Ms. Stidom could perform a range of light unskilled work at Steps Four and Five, the ALJ analyzed Ms. Stidom's subjective allegations, mental health treatment records, and the consistency of her allegations with the record as follows:

> At the hearing, the claimant testified that she cannot work primarily due to PTSD and depression. She stated that she is currently taking Trazadone and Seroquel, her medications help a little, and she receives counseling services at Phoenix Rising Behavioral Healthcare. The claimant described her mental health symptoms to include having difficulty around other people, getting upset easily, not wanting to get out of bed or leave her house, difficulty sleeping at night, hearing voices, and seeing things that are not there such as shadows. According to the claimant, she experiences panic attacks that occur when she is around groups of people, her panic attacks last for 20 to 30 minutes, and her panic symptoms include feeling like everyone is talking about her, increased heart beating, dizziness, and shortness of breath.
>
> …
>
> She had some counseling and medication management sessions at Phoenix Rising Behavioral Health since the alleged onset date. In January 2019, the claimant presented there for a counseling session, with reports that she had ongoing mood swings. According to the claimant, she was currently smoking cannabis three times per week, had difficulty leaving her house or being around other people, and experienced trauma when her house caught fire in 2017 (Exhibit 21F, pg. 104). Upon mental status examination at this time, the claimant had a euthymic mood, a full affect, borderline intelligence, and there was no evidence of hallucinations or delusions (Exhibit 21F, pg. 105). Treating notes from Phoenix Rising taken in February 2020 indicate that the claimant was currently smoking one bowl of cannabis on a daily basis. According to the claimant, her current activities of daily living included watching movies, playing with her dogs, cleaning her house, cooking for her son, and grocery shopping with her sister. The claimant reported having ongoing issues with headaches, but they did not occur as often recently, and she was no longer napping during the day (Exhibit 21F, pg. 4). A mental status examination performed at this time revealed that the claimant was alert and oriented to all spheres, her mood was euthymic, there was no evidence of hallucinations or delusions, her eye contact was average, her behavior was cooperative, and her cognition was within normal limits (Exhibit 21F, pg. 5). Based on these findings, the claimant's counselor diagnosed her with PTSD – chronic, mood disorder – chronic, cannabis dependence – uncomplicated, and advised her to continue taking her medications as prescribed, including Seroquel and Trazodone (Exhibit 21F, pg. 8).
>
> …

24

Regarding the consistency of the claimant's mental health allegations, there is no evidence of psychiatric hospitalization in the record, and she saw significant improvement from her psychotropic medications and treatment.  <u>Additionally, the claimant reported mostly mild to moderate level symptoms to providers at Phoenix Rising, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues</u> (although the claimant reported having hallucinations and delusions at the hearing, she repeatedly denied having any to providers at Phoenix Rising) (Exhibit 11F; 12F; 15F; 18F; 19F; 21F).  The claimant has a history of non-compliance with medical recommendations, further eroding the consistency of her allegations.  For example, she repeatedly report[ed] smoking marijuana on up to a daily basis in spite of her asthma and breathing issues, which has also exacerbated her mental health symptoms (Exhibit 21F, pg. 4).  Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged.  For example, she testified that on a typical day, her boyfriend makes a list of things for her to do, including cooking, household chores such as laundry, taking care of their dogs, and going grocery shopping with a friend (hearing testimony).

(Tr. 73-75 (emphasis added).)

A review of the above analysis reveals that the ALJ did not acknowledge Ms. Stidom's subjective complaints of dissociative symptoms, and also failed to address her providers' objective observations of apparent dissociative episodes and related behaviors.  For example, he did not mention her hearing testimony that she had blackouts after which she could not remember what had happened.  (Tr. 97.)  He did not mention her repeated reports to her mental health providers that she had other personalities and/or blackouts after which she was not able to remember her actions.  (*See, e.g.,* Tr. 355, 711, 728, 740, 757, 759, 780, 797, 836-37, 842, 851, 854.)  He also failed to acknowledge observations by two different therapists at four different therapy sessions that Ms. Stidom appeared to have undergone a significant personality shift. (September 2018 (Tr. 754-57), February 2019 (Tr. 707-11), April 2019 (Tr. 774-78), January 2020 (Tr. 894-98).)  In some of those instances, it is noted that the provider was concerned enough to call in a supervisor to assess Ms. Stidom's safety.  (Tr. 757, 897.)

Beyond failing to acknowledge the instances where Ms. Stidom and her providers reported apparent dissociative episodes, the ALJ's recitation of normal mental status examination

findings (Tr. 73-75) omits reference to symptomatic mental status examination findings that may have been consistent with the reported dissociative symptoms, including depersonalizations (Tr. 713, 755, 764, 794), racing, incoherent, or slowed thoughts (Tr. 755, 764, 781), paranoid thoughts (Tr. 713, 764), poverty of thought (Tr. 781), memory impairment (Tr. 755), intense eye contact (Tr. 728, 755), rigid or slumped posture (Tr. 713, 755), rapid or slowed speech (Tr. 728, 755, 764), silly or childlike mood, affect, or speech (Tr. 728, 755, 757, 781, 897), and impaired insight or judgment (Tr. 719, 731, 755, 764, 781, 843, 874).

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir. 1984)).  The *Rogers* court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history."  *Rogers,* 486 F.3d at 249.

Thus, even though the standard does not set a high bar, it does require discussion of the significant probative evidence.  *See, e.g., Saez v. Colvin*, 216 F. Supp. 3d 497, 511 (M.D. Pa. 2016) ("[I]t is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, 'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'") (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979)); *Jean V. v. Saul*, No. 1:19-CV-00240-REB, 2021 WL 1220619, at *7 (D. Idaho Mar. 31, 2021) ("More fundamentally, and as a separate instance of error, the ALJ's decision is not supported by substantial evidence in that it

fails to discuss significant probative evidence. … It is not the ALJ's duty to discuss every piece of evidence in the record – even every relevant piece of evidence. But it is the ALJ's duty to support his decision with record evidence, and he did not do so adequately here.").

In analyzing the entire record, the ALJ also has a responsibility to acknowledge and resolve conflicts in evidence.  *See Richardson v. Perales,* 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").  Moreover, it is well-settled that an "ALJ may not pick and choose, without a good medical or other reason for doing so, those limited aspects of the record that he or she chooses, while rejecting other aspects of the record without an identifiable basis for doing so."  *Jones v. Comm'r of Soc. Sec.*, No. 3:13-CV-019, 2014 WL 340427, at *4 (S.D. Ohio Jan. 30, 2014), *report and recommendation adopted in part, rejected in part*, 2014 WL 1050042 (S.D. Ohio Mar. 17, 2014).

Indeed, where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, courts have routinely held that the ALJ erred by failing to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL

2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

Here, the ALJ failed to acknowledge Ms. Stidom's recurrent complaints of blackouts and dissociative episodes, and also failed to discuss treatment records where her providers recorded observations of apparent dissociative episodes and related mental status examination findings. Without mentioning those complaints or the related evidence, the ALJ nevertheless concluded Ms. Stidom's allegations were not wholly consistent with her medical records in part because she "<u>reported mostly mild to moderate level symptoms to providers at Phoenix Rising, without evidence of</u> hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or <u>other serious issues</u>…"  (Tr. 75 (emphasis added).)

Upon review of the evidence, it does not appear accurate to characterize Ms. Stidom's complaints of dissociative symptoms as "mostly mild to moderate," or the objective evidence of personality shifts and symptomatic mental status examinations as reflecting no evidence of "other serious [mental health] issues."  *See, e.g., Donacien v. Comm'r of Soc. Sec.*, No. 19-CV-1528 (MKB), 2021 WL 695121, at *12 (E.D.N.Y. Feb. 23, 2021) ("Because the record indicates that, in addition to anxiety and depression, Plaintiff also experienced short-term memory loss and other dissociative symptoms, [], paranoid thoughts, [], flashbacks, [], social isolation, [], and an inability to leave the house unless accompanied by family members, [], the Court finds that the ALJ mischaracterized Dr. Reyes' reports as indicating that Plaintiff only experienced mood abnormalities.").  Certainly, the ALJ has provided no discussion to support such a characterization.  *Cf. Camp v. Soc. Sec. Admin.*, No. 2:13-0034, 2015 WL 9413878, at *7 (M.D. Tenn. Dec. 22, 2015), *report and recommendation adopted sub nom. Camp v. Colvin*, No. 2:13-CV-00034, 2016 WL 166067 (M.D. Tenn. Jan. 13, 2016) (finding no error in failure to consider

28

dissociative personality disorder severe where reports of alter ego were scarce, plaintiff reported overall benefit from her medication regimen, and ALJ discussed dissociative symptoms and explicitly found they would be accommodated by RFC).

Because the ALJ did not discuss the dissociative complaints or the related objective evidence in his analysis, it is not possible for the undersigned to determine whether he considered that evidence in making his findings. If he did not consider the evidence for the reasons suggested by the Commissioner, *i.e.,* because he found it relevant only to a non-medically determinable impairment, he has not explained his basis for finding that the same signs and symptoms were not also related to Ms. Stidom's medically determinable mental impairments. Alternately, if he did consider the evidence but simply failed to mention it in his analysis, he has failed to provide an adequate explanation to warrant a conclusion that his findings at Steps Three and Four were supported by substantial evidence.

For all of the reasons set forth above, the undersigned finds that the ALJ's failure to acknowledge Ms. Stidom's complaints of dissociative symptoms, and further failure to discuss the objective evidence supportive of those complaints, has resulted in a decision that lacks the support of substantial evidence and fails to provide an "accurate and logical bridge" between the evidence and the result. *Fleischer*, 774 F. Supp. 2d at 877. The undersigned accordingly recommends that the decision be remanded for further proceedings.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider all subjective complaints and objective evidence relevant to Ms. Stidom's severe medically determinable mental impairments, should accurately discuss the significant probative evidence, should resolve any conflicts in evidence, and should ensure that he builds an accurate and logical bridge between the evidence and the result.  To the extent the ALJ concludes the dissociative symptoms do not relate to a medically determinable impairment, the grounds for that conclusion should be clearly set forth in the decision.

May 10, 2022                                    */s/Amanda M. Knapp*

_____
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).